and our expert just did a couple of different analysis because it was there there's no way to actually put a micrometer on these very very small edge pieces so he did a just a kind of an analysis of like well how much product is in those pieces and he did it two ways one was kind of an area analysis and that's in his expert report and he concluded that just as an overall area it was less than 1% of the overall area was contained in these two edge features. But the lower court made a specific finding that that area and weight were not appropriate measurements. You're right. So how do we get around that? Well, I believe that the lower court overlooked the expertise of the expert who conducted this analysis and what he said in his... Are you talking about Sarah? This is Dr. Sarah. Okay. At his deposition and this is at JA 290 at the deposition transcript. Just to kind of precede, he was asked a question the patent doesn't concern yourself with weight or mass. Yes, it just talks about thickness. That's what you chose to measure. How did you come up with that? His answer, no that was from my 40 years of experience in the adhesive industry because measuring thickness can be very difficult at times so whenever there's a there's no question about weight. Well, I'm confused here by the use in your expert's declaration and testimony of area, which is where you get the 99% and the deviation from the otherwise uniformity in height, which is where the 18.5% comes. So we're comparing apples to oranges I think when we compare the 99% and the 18.5% it seems to me. And what I don't understand is exactly what your position is with respect to the meaning of substantially uniform thickness. Are you saying that something... Let me give you an example. Is something substantially uniform in thickness, if it is let's say one millimeter thick over 99% of its area, but then it has a three millimeter spike all the way around the circumference of the surface. Right. Would that be a surface that would be substantially uniform in thickness? I mean from that hypothetical and it sounds like there might be some question about that. We'd have to have somebody who's skilled in whatever that is. The hypothetical is intended to draw out the at a particular point, in which case that would be obviously quite substantial. It would be a very large deviation. Or are we talking about the surface area of the deviations no matter how large they are? Right. Which do you think is the right construction of the term substantially uniform thickness in claim 5? Without significant protrusions? Let's leave the claim construction. I think there's a couple of ways that you could figure that out. I want to know what your position is on that. I think that is certainly a measurement feature. If it's measurable with a tape measure, for example, I think that would be a reasonable comparison. I think in this case where the features are small, I think assessing weight, which was also less than 1% of the total contribution of the lateral edge features and area. Dr. Serra explained the reason he did both area and weight was to see if they jive. Do they make sense together? And when he got kind of the same number under both of those analyses, he concluded that a deviation of less than 1% in area backed up with weight was not significant in his opinion. But he would have reached the same conclusion, I assume, in my hypothetical if he was basing this on area and weight as opposed to the height of the deviation. I think he would have probably considered that as well and factored that in, but I don't know. Does the reference to significant mean that we're referring only to the height of the deviation? I think the reference to significance means the overall limitation is directed towards thickness. That's what that one particular element that where this term comes in calls for. So I think what we're talking about is the thickness of the deviations or steps. And the real fundamental question here is, does Dr. Serra's 40 years and his opinion on whether or not those are significant, does that get taken from a jury? This is Shieldmark's opportunity to present this case. If there is a factual dispute, that's fine, but we get a chance to convince a jury with Dr. Serra's testimony that those edge features are insignificant in the terms of that claim. Do you mind if we keep going so we can get to the other issue? No, no, please. Okay. Your time's almost up. We're going to restore more. We'll give you more time, Mr. Weber, as well, because there's a lot of issues in this case, so we're going to keep going. Any more on those, or can I move to another topic? Yeah, that's fine. All right. We may want to come back to that, but let's move to... Well, let me ask a follow-up question. This is really a follow-up question, I guess, to Judge Serrano's question. If we should conclude that substantially uniform thickness refers to the deviation in height as opposed to something that's a function of area or weight, is there anything in the record introduced by your client at the summary judgment stage that would support an argument that the deviation in height in this case of 18.5 percent or whatever it is was not substantial? I think the only way that we could look at it is maybe from that other potential functional angle. So is there anything in the record that would talk about whether or not these edge features have any functional significance? I know Insight claims that they do. Jerry Serra actually had an opportunity, Dr. Serra, Shieldmark's expert, had an opportunity to opine on that as well. And in his opinion, he didn't feel that even the function would be accomplished with these edge features. Can you point me to that? I think you pointed me to 370 of the expert report. Can you show me very specifically where he says either there or even more importantly in response to the summary judgment question, the other side says the steps have among their kinds of significance, they have a functional significance. I disagree. I don't think they have that functional significance. Just show me where he says that, please. This is JA333. This is a cross-examination from Dr. Serra's deposition. Maybe start at about line 7. Here he's asked, I'm paraphrasing, is there any functional significance to the steps? And his answer begins on line 14. It says, my understanding is that the step prevents the adhesive from oozing out from underneath that edge. That's insight's position on this. Then he goes on to pick up right after that at line 17. And while I disagree with that, and then he goes on to list why, that the functional significance would actually be defeated if these tapes were used as intended. And due to the viscoelastic nature of the adhesive that's used, there would inevitably be some kind of ooze underneath even the lateral edges. And especially, imagine if a forklift parked on top of one, the edges would actually probably even peel up because there is no adhesive underneath of those lateral edges. That's one of the design features. But Judge Toronto, that's what I'm referring to. Let me loop back around to Judge Bryce's question because as I look, just sort of looking at the grammar of this claim construction, it seems that the first part of the claim construction, a largely but not necessarily wholly uniform distance between the upper surface and the lower surface would go to the question of how many deviations you can have. And then the second part that says without significant deviations would imply that however many you have, none of them can be significant. And that would seem to be the height reference, right? Yes. I believe that is the height reference. Yes, Your Honor. Okay. Anything else? No. All right. Let me go to the other issues. My first question is because I want to make sure we're not here doing anything that's really just a hypothetical exercise or theoretical exercise. And Claim 2 has been canceled. Yes, Your Honor. Right. So what is it that Claim 4 adds from a patentability standpoint? Why is Claim 4 alive? Well, the PTAB during a re-examination proceeding concluded that Claim 4, and I don't think they specified exactly what it's there, but it adds limitations that are directed towards an IOM marking system in use on a floor. That's really all it adds. Because in Claim 2, it said for use on a floor. So Claim 2 included the use on a floor. So the only thing left is that you put it on a floor for purposes of IOM marking. I mean, perhaps. The only other difference that I can see, Your Honor, is that in Claim 2, the application for a flooring environment is in the preamble. So maybe that wasn't accorded patentable weight in the re-exam, and so they canceled the claim based on the other elements. And Claim 4, on the other hand, actively says that the tape is applied to surfaces including a substantially plainer floor adhered to the adhesive tape on the opposing tide where it provides an IOM marking system. Okay. So let's go to your question. Can I just add something? Maybe this is just a follow-up and maybe you won't have an answer. As a legal matter, if we were to ask the question about the significance of Claim 4, and not if we were to, but in an invalidity inquiry, does one take as a given that against you that Claim 2 is invalid, or does that play no role in the analysis? What's the effect of the cancellation? You know, I'm not sure. So I think what I can say is that Claim 2 has been canceled. So Claim 4, in its present instantation, includes all the elements obviously of Claim 2, plus that little bit at the end that Claim 4 does add. I guess my question is, does the cancellation amount to a concession or binding determination, binding on you, that Claim 2 is actually invalid? I really haven't given that a lot of thought. That's something I... Okay. So on double-sided adhesive layer, this is obviously not the easiest thing to sort out, but it's plowing through the prosecution history here. When you address with the examiner the rejection of Claim 11, which is the double-sided adhesive tape, you told the examiner that the examiner's interpretation of that was repugnant, which was an interesting word, but you also argued that there has to be something more than just two sides of adhesion because otherwise things like chewing gum and paint would fall within the category of this double-sided tape, right? And then you later said that with respect to Claim 12, which became Claim 2, that your argument against the rejection on similar grounds was based on the same analogy. So why doesn't that actually operate as a full disclaimer of anything that doesn't include a substrate or a layer that's non-adhesive in the middle? I think there's a couple answers to that. One, a lot of the other answers are, well, we'll just call it a layer, we'll call it double-sided adhesive layer, and then a layer of pressure-sensitive adhesive. The claim that you're talking about, and again, forgive me because I can't pull that right up here in my joint appendix, where those arguments were first made before the examiner was in some of the original claims, and it's I think what has become now Claim 11. It was Claim 7 originally. And that limitation where we were making those arguments, it's a further limitation on the adhesive, the layer of adhesive of Claim 5. And what we do is we further limit it, and we say where the adhesive comprises a rubberized double-sided tape. And that's when we talked about, because the examiner presented something, and it was presumed to be rubberized double-sided, and that limitation was overcome for what became Claim 11, what was originally Claim 7. And then when we said, referencing back to what is now Claim 2 with the double-sided adhesive, the shorthand of, well, we'll just use those same remarks. I mean, I think it was just a shorthand to conserve resources, because the Claim 2 element clearly isn't a rubberized double-sided tape. I mean, that's very specific. Claim 2, and it's narrower than what is in Claim 2 with just a double-sided layer. Well, it may have been shorthand, but why wasn't it shorthand for a reference to an argument that something to be double-sided could not simply be an adhesive which was sticky throughout or on both sides? Because that does seem to be what you're referencing back to when you discuss Claim 12. You're referencing back to the discussion of Claim 7, and that's the exact subject matter of that argument that you made in connection with Claim 7. Why aren't you stuck with that? Well, I think for Claim 7, for the rubberized double-sided tape, we are stuck with that. Right. And then you say exactly the same argument. Our response is exactly the same with respect to 12. Why aren't you stuck with that with respect to 12? Well, I think because, I mean, with respect to Claim 2, the limitation is different. And so I think that takes it out of it right there. So what did you mean to say when you said, for reasons set forth above in Claim 7, with respect to Claim 7, this rejection is improper? What were you saying to the examiner at that point? I think we were saying that the alleged, I think it was still an allegation, that the combination was improper and didn't actually teach the claim limitation. And what about the arguments that were made vis-à-vis Claim 7 were you incorporating? Right. The arguments in Claim 7, there were other aspects to that besides just the rubberized tape. I know that was the predominant argument with respect to that the particular claim elements that we're calling for here are different. I think that's, I mean, I think that overcomes it. And especially here, with this particular element, we're not even asserting literal infringement. So this whole question kind of gets pushed off to one side because what we're asserting here is infringement under the doctrine of the principle. But if you've given up the single layer of adhesive argument by virtue of the prosecution history, then why isn't that argument-based prosecution history to stop it? For purposes of equivalence. No, I understand. And I think in this case it isn't because of what we were saying before about the differences and the limitations themselves. Right. But the fact that this is equivalence doesn't help you, right? No, no, no. When you say no, no, no, are you agreeing with me that the fact that it's equivalence doesn't get you any additional, put in any additional force? If what the result here is that there is prosecution history estoppel with regard to that element, I agree we don't get to the doctrine of equivalence. So the doctrine of equivalence argument adds nothing. Assuming we found that. Assuming we found it. Can you explain more broadly in this quite lengthy prosecution history? I think this is an extremely troubling passage for you. On the other hand, as far as I can tell from looking at this, it's unique in the 500 page prosecution history of the 480, where as far as I can tell there was never any other argument you made about Claim 12 that took issue with the examiner's statement that the spicum itself, when painted as a layer, is double sided and so on. Can you help me understand whether this was aberrational or representative or how to think about this in the larger context of the prosecution history? The two paragraphs of distinctions for Claim 7 are all about tape is not the same as a layer of spicum. And that's all there is in there. And then you say for the same reasons, not for the same, for reasons set forth above with respect to Claim 7, this rejection of Claim 12 is improper. And it doesn't say for the same reasons, it says for reasons, but the trouble is that the only reasons given have to do with this being tape. I think the limitation that we were first arguing about is where the adhesive is a rubberized double sided tape. This is one of the specific examples that's actually called for in the specification. It was actually a carpet tape that was used on the original kind of prototype floor marking lines that we used. So in that case, I took exception to what the examiner was trying to say because a rubberized double sided carpet tape has exactly the structure that has been incorporated into this patent. In other words, it does have that mesh or a non-adhesive layer that is sandwiched between two adhesive layers. The complaint with the examiner with respect to Claim 7 was that the reference that was showed didn't include any of that additional structure. Later on, there's a lot of back and forth and up and down. Can you explain, the examiner ultimately accepts Claim 7 which becomes Claim 11 and she ultimately accepts Claim 12 which becomes Claim 2. What were the reasons given for those two different determinations of the examiner? For eventually allowing Claim 7 and eventually allowing Claim 12. I'm trying to understand because I didn't at least see that this joining of 7 and 12 which you do in this January 2006 filing continues throughout the rest of the prosecution. In the examiner's reasons for allowance, first of all getting to the reasons of allowance. I understand that from your perspective it seemed to take a long time but really this case was four office actions. One trip to the board, reconsideration, a trip here that was kind of squashed by the solicitor's office and remanded back down. But were different reasons given for overcoming the rejection of 7 and the rejection of 12. The examiner who allowed the case with the additional limitations that had then been added gave no discussion at all about what was important about a layer of adhesive, a double sided adhesive. The adhesive layer didn't even rise, wasn't even worthy of a comment. The focus was on the other limitations. I think we need to move on. We'll restore your three minutes of rebuttal and we'll give Mr. Webber another 12 minutes. Thank you, Your Honor. If it pleased the court, I first of all have to say this court has apparently done an outstanding job in really digging into the prosecution history of this case. I think there's other ways of looking at this which we addressed all that in the Markman hearing and I was sort of surprised on the substantially uniform thickness because the court had adopted, I thought, the appellant's proffered definition. Well, that's not exactly accurate. The word significant was not in the appellant's proffered definition. You injected the word significant into the claim construction and you convinced the court to put significant in there. So my question is that if we are to try to assess what significant means, why were you even arguing over whether there was a significant functionality to any deviation? I wasn't arguing so much the functionality as the fact that these deviations, protrusions or steps are not incidental to the manufacture of the product. When you're making a product or you're extruding a product, you can get some wave, you can get some deviations, if you will, protrusions or steps. And I would be very happy to withdraw the significant in light of the discussion here today. But if I look at this table, this table certainly looks planar. But it has grain to it. There are recesses in this table. And I wanted just to make sure that we were talking about stuff that was meaningful and what we have is meaningful. If we're supposed to assess whether something's meaningful, why wouldn't we, going back to the prosecution history, why wouldn't we assess what constitutes significant deviations or steps against the Mauer patent that the patentee was trying to get over, the prior art that the patentee was trying to essentially disclaim coverage of? Because the problem with that is that we're talking about 250% steps. We're not talking about an 18% differential. So wouldn't that actually hurt you if we're actually looking to see what it was that, what prior art they were trying to overcome by using substantial uniformity? If you were going to say it had to be 200%, but I think that 20% or 18.5% is substantial structurally. And they never addressed that. But I think that an 18.5% or a 20% step is a significant step. If you have a, I don't know what this is, 10 foot here and you put a 2 foot box over there, you'd say that's significant. But what are we measuring this against, just common sense or shouldn't we measure it against the prior art they were trying to overcome? Well, I think you look at the prior art that you overcome and the purpose of the significance or the absence of significant steps. I think your Honor hit on it when you said the court's construction has two facets to it. One is the first part is a largely but not necessarily wholly uniform distance between the top and bottom. But the other is without significant deviations, protrusions or steps. You don't blend the two and I think Judge Bryson was hitting on that. You can't say, I've got these great big tall spikes here in this and those are certainly significant, but yeah, if I average them out over the total thickness on this real wide piece, they substantially disappear. Well, you might have something that's largely but not necessarily wholly uniform distance, but you also have to have it without significant deviations. Right, but what do we measure significance against? Mauer at 250 and 500 percent differential or something else? Well, no, I don't think that you go to Mauer or else, they've certainly never argued that and they've recognized by their approach in assessing thickness by doing it with a linear measurement. That's how you measure thickness. It's significant. That's the reason they did that. It was, I guess, good experting. I don't know that I agree that that's good experting, but I think that that was, well, I won't even go there. I think if you're going to talk about thickness, you talk about a linear measurement and that's what the district court said. But Sarah did say that given his 40 years experience in the industry that these are good substitutes for making a linear measurement because it's almost impossible to make with something this thin. But he didn't need that. He had our die. He had our die. But I don't think that's quite the point. I mean, I think he, it's perfectly possible to say, I don't want to say what he said, to say we in the industry don't view linear measurement as significant, even if you can measure it. And one of the reasons we don't view it as significant is that quite generally you can't measure it. So why does the fact that he had your die change the significance of his general point that this difference was insignificant considering the way we in the industry measure these things? Because he could measure it. You just gave the excuse for the thickness. He didn't have to measure the thickness. He stipulated in his deposition what these measurements were. And he said he even thought about that, but he didn't put it in his report. And that's where the district court judge, that's where Judge Nugent took him to task and said, come on, we're talking about thickness. You've got the dimensions there. Why don't we man up and talk about those dimensions? Sure, I can find a way to make it all disappear. And I can find a way to say, I'm going to average it out over all of this distance. I'm going to say, well, in the big scheme of this, these things, even though they're a mile high, substantially disappear. But if they're a mile high, they're significant. And those steps are significant, and they're significant both structurally and functionally. And the bottom line is they never adjust. Is there in fact a dispute in the record at summary judgment of whether this one function you identified about keeping the glue-ish stuff inside the tape rather than outside is not significant? I don't think he says that at 370, but the deposition passage that was No, I don't think that he said that. He said that it might retard or slow it. It was all conclusive restatement. He never had, for any of what he did, he never really had any assessment of facts. He never said, I took this thing, I put it down, I ran a card over it, I did whatever. He just said, well, it's this type of an adhesive. Well, first of all, the claim doesn't require any specific type of adhesive. Only one claim says it's pressure sensitive, and even there it could have any of various types of compounds making it up. So he comes up with the Well, it would impede it, it would, you know, it might slow it down. And in fact, that's what Judge Nugent said at page nine in footnote three of his opinion when he's saying, you know, what the defendant or the defendant-appellee did was he put these steps in to define a recess between them so that he could put the adhesive between those steps and in that recess, and it would hold it. Whatever else that is, that can't be a finding of fact, because we're not on finding of facts. The only question is whether this exchange, 333 to 334, does or does not create a genuine issue of disputed fact about the significance of the steps, the particular significance that you asserted on your side about it holding the glue inside the tape. No, and I do not believe that it does. I think that's just a conclusory statement with no factual basis, no underpinnings whatsoever. Well, it does have some factual basis. He describes how a certain heavy truck, he doesn't understand how it's not going to in fact ooze up and you have a little space underneath and in fact you press on this space and this edge is going to come up, but not no factual basis. The question is does it get to the point of the significance of this asserted function? No, because again, you go to what's the size significance. So I got a step that's 18 and a half percent. Forget what's in there. Forget the reason. Let's back away from the reason that it's there or the function it performs and let's just talk about is that a substantial deviation, protrusion or step, one that is intentional, one that is there, one that is not just the result of some old, it was doing whatever and so you've got some imperfections in this extrudate as it's coming out. We're not going to say that those are protrusions, deviations or steps in the context of the claim construction because they're really not. But what are are the ones that the die says I want there. Is your position, you made a reference to the deposition testimony reference to retarding and slowing, but it's going to ooze anyway. Is your position that for purposes of the functional significance now, that the testimony about the fact that it wouldn't work or at least it wouldn't work very well is not really contrary to the argument that it had this intended function, which would work at least to some effect. Is that your argument with respect to your answer with respect to the question of what the role of his testimony is in the dispute of the question of whether there's a dispute. I'm not sure that I followed it and it's my fault, not yours. I probably didn't put it very well. What I'm trying to get at is this. I'm trying to say you made reference to the fact that he said, well, it will impair and impede using, but it won't completely prevent it. Is that another way of saying what I thought you were saying that maybe, maybe not, that it still has functionality even though it doesn't do the job perfectly? Well, sure. Sure. Because I'll tell you what, if you didn't have those steps there and you put it on, it would be out tomorrow. And that's the reason you have the non-adhesive material in that tape. The reason they don't have to have the recess is they put the non-adhesive, carpet tape is double backed tape, and it has a non-adhesive layer with stick-em on both sides. And that non-adhesive layer, the purpose of that is to confine the adhesive. So it isn't like I just squirted out a bead of adhesive here and then I watch it start to sort of ebb and flow and move out. I have a substrate in there, it's a cloth substrate typically, and that adhesive is on both sides and that way I can pull it off, I can manipulate it, I can put it, when I'm going to seam this carpet, I can put it on the back and put the hot iron on it and away you go. Or now they don't even put the hot iron on it. And that's the reason we have to have the recess and the steps. Can I change the subject? Yeah, because I did. The remaining issue, the other issue, the claim for issue. Did you argue prosecution disclaimer either by way of claim construction or by way of prosecution history estoppel and doctrine of equivalence on the one passage in the prosecution history that seems distinctive? No, I don't. I remember arguing in claim construction going through the prosecution history. If something was bestowed out or if there's any issues of that nature, but I appreciate clearly what the court was saying. The court has gone through this thing carefully. I'm wondering what to do with this. If I weren't looking at the prosecution history, I would be looking at the statute of limitations, which just shows the stickum. It doesn't say anything about some kind of mesh inside, interior to the gooey stuff itself. And the reference to, if you want to know what adhesives to use, look at this other patent. And that patent, while defining an adhesive structure, everywhere uses the term adhesive to mean the stickum itself. As far as I can tell, that's equally true of every one of the prior art patents that was discussed in the prosecution history. One obviously has to deal with any question of claim differentiation and so on. But this prosecution history is, to me, striking in its weight on the other side, and yet you never advance it. You can't tell the patent office one thing and try to tell the court another thing. Did you ever cite to the district court this passage of the prosecution history? Did you make an argument-based prosecution history gestapo argument to the district court at any point in the procedure? I know we addressed prosecution history in the Markman, but on... On the Doctrine of Equivalence. You did not? I don't believe I did. The record will be whatever the record is, but I don't believe that I did. The other way you get to the construction is to do claim differentiation. They have three claims, all claiming some type of adhesive. Can you tell me if you can agree with this much, that even under their claim construction, the claims retain different scope because of other things, other elements? I think that's true. I don't think that this is a classic claim differentiation argument where if you adopt their claim construction, then one claim truly is of the same scope as another claim. Well, they're awfully close. They are awfully close. That's what you're probably right. It's not a textbook. Other limitations. Assuming that we were to say that you didn't make a prosecution history gestapo argument for purposes of DOE, then you're left with the vitiation question, correct, for DOE? Vitiation, at least vitiation, that's correct. Well, when you say at least vitiation, did you make an alternative DOE argument? They have to, on summary judgment, at least raise an issue of fact. They never presented anything, any evidence or any opinion as to what the function was of that non-adhesive material that the court said is a limitation of this claim. But isn't our case law such that vitiation for purposes of DOE is really only applicable when you have the opposite of the claim as opposed to a missing limitation? Because by definition, we wouldn't be looking at DOE if we weren't talking about a missing limitation. But we do have the antithesis of this. We have no non-adhesive layer. Is that the antithesis or is that a missing limitation? I think it's the antithesis. If you specifically say you have to have a non-adhesive layer with a non-adhesive layer, all you have is a bead of adhesive. Wouldn't that wipe out the doctrine of equivalence entirely? No, because the thing that they didn't do and a reason why summary judgment was appropriate is they never addressed an equivalent for the adhesive layer. The non-adhesive layer, I apologize. They never talked about it. In fact, Sarah says it simply includes a non-adhesive layer. That's the difference. It just simply includes a non-adhesive layer. That's not just a simple inclusion. That's put in there for a remarkable specific purpose. And he never addresses that purpose nor does he ever address how we do the equivalent, how we meet that way as Judge Nugent said. He said, look, you're right. Both of these perform the same function and the same result. They stick it to the floor. But the way is what was never addressed. The primary argument on vitiation was if it's not fair, then you need to sell it. But that's not the way the law works, right? Well, right. I was really looking at them not having that element. So your alternative argument is that we have to do DOE on a limitation by limitation basis, then what has to be equivalent, you have to have an equivalent to that missing limitation, not just to the invention as a whole. Right. And that's the standard DOE, I think. And that's what they didn't do. That's what they didn't do. And that's what Judge Nugent said on page nine in footnote three, I think. I can find it here myself. You know, if you look up the top of page nine, he says, well, it may be argued that any adhesive may serve the same function and produce the same result, i.e. to adhere as the double-sided adhesive called for in the patent, the way in which double-sided adhesive works compared to other layers of adhesive was deemed significant and important enough to the inventor-applicant to require differentiation within the patent language. So he says that first of all, but then he takes you down to the footnote. He says there is no evidence to the same way as a double-sided adhesive in plaintiff's product because prior to the addition of the edge feature or channel offset by the steps in the accused product, there would have been no means of containing the adhesive strictly to the underside of the product without the potential of some degree of spread. So that's where he's saying you can't just say it adheres. What's the difference? I've construed this. Whether he construed it right or not is something that you'll determine. But he says, according to my construction, you have to have this non-adhesive material in there. They don't have the non-adhesive material. We all agree on that because we're on the doctrine of equivalence. So where's the equivalent? Where's the genuine issue of material fact that they have raised to show that there's infringement? And it's not there. They've never addressed it. That's what the judge took them to task for. And they can't do it. These products are totally different to the extent you can be different when you're talking about floor marking tape. You've got to have a surface. You've got to have an underside. You've got to have some of these to hold them down, etc. But there's just remarkable differences. And I don't think that in fact, I know, but I hope that you will agree, they never developed an issue. Just say, well, it sticks down. They simply put in a non-adhesive layer. Well, that's the difference. Don't call it simple. And you yourselves, as this court has pointed out, argued those differences when you were prosecuting this case. So it can't be inconsequential. It can't be just simple. It can't be meaningless. Any other questions? All right. Thank you. Thank you. Three minutes for rebuttal. Can I ask you about this whey business? Yes. What is the evidence in the record about why using an adhesive that's different from a double-sided tape, which is I think what we're talking about here, why they perform their functions and achieve the same result in the same way? Forget about function and result. Tell me about whey. What's the evidence on similar whey? So the limitation in question here is the 373, it actually begins. The last paragraph, he talks about his inspection of the sample. And then on the top of page 8, he goes into both the function whey result analysis. What page of the appendix? It begins on 373 and it bridges over to 374. All right. Those two paragraphs, I will confess I'm not quite sure what I'm looking for by way of an explanation of similarity of whey. As a general doctrinal matter, I'm not sure that this says anything other than they both stick, which I'm having a hard time distinguishing from function and result. Which I admit might be a general doctrinal problem, but to the extent that whey means something different, I'm not sure that this is supplying additional information. I think the way it does it is it adheres to the polymer layer on one side and adheres to the floor layer on the other side. That is the way that the adhesive layer, as defined in the claim, operates. To what extent was the argument that your opposing counsel has made here fleshed out for the district judge? And in that respect, what I'm referring to is the specific argument that the critical difference between your patented invention and their product is that your invention, by using tape that has a substrate, does not have the problem of oozing that they were trying to overcome by using the feet at the edge. Was that argument made to the district court explicitly in the context of this doctrine of equivalence? I don't believe so, Your Honor. Even more so, that's just one claim, one independent claim of several in our patent that includes that element, per the claim construction, of the non-adhesive layer that has to hold the adhesive in. Claim one doesn't have anything like that. It just requires a pressure sensitive adhesive. And claim five doesn't include that. It just has a layer of adhesive. And, you know, as to I don't know that we're done with this issue. But I just want to just talk about a couple of points that counsel made. This is regarding the thickness limitation, whether significant or not, and I apologize. And the point, I think, counsel just kind of beats the table on is, well, we had the dye. Well, we didn't use the dye of infringing the patent. We included the product that came out of the dye. And I don't think that even counsel will say that the product is going to conform exactly to the dye. There's going to be some... It seems to me the dye is a pretty good proxy for the product. But the really good proxy for the product is the product itself. And that's what Dr. Serra tested. And he couldn't figure out how to measure these very small little rounded edges. And so he came up with a way to do that and to determine thickness. Can I ask you the same question that I asked the other side about this striking passage from the prosecution history, which has to do with 480 patent claim 4, not the others? I think your friend said that he couldn't remember this passage having been brought to the attention of the district court, whether in claim construction or in the prosecution history. Do you have a different recollection or the same recollection? I really don't have any recollection of that. I wasn't prepared for it. It certainly wasn't in these briefs, right? In the summary judgment brief, they do cite Festo, though, and do say that the two claim elements in issue were added to the claims by way of amendment and were argued in support of patentability during the prosecution of the patent in suit. True. The claim was filed, had one independent claim and nine dependent claims. On the first office action, we added the remaining claims. We introduced limitations that I don't think were substantively argued really thereafter. Thank you. Thank you both counsel for your thorough presentation. I know you didn't anticipate being on your feet so long. All right. The Honorable Court is adjourned until tomorrow morning at 10 o'clock a.m.